IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE TRAVELERS INDEMNITY COMPANY, Successor in Interest by Merger to GULF INSURANCE COMPANY,<br>     Plaintiff | :<br>:<br>:<br>:<br>: |
| vs. | :   CIVIL NO. 1:CV-05-1864 |
| PETER BALLANTINE,<br>ALISON BALLANTINE,<br>BEN WOOTON,<br>PATRICIA WOOTON,<br>     Defendants | :<br>:<br>:<br>:<br>: |

M E M O R A N D U M

I.   Introduction

The Plaintiff, The Travelers Indemnity Company ("Travelers"), has filed a motion for summary judgement and a motion in limine to preclude parol evidence.  The Defendants, Peter and Alison Ballantine and Ben and Patricia Wootton, oppose the motions.

II.   Facts[1]

On January 29, 2004, the Defendants entered into a General Agreement of Indemnity ("GAI") with the Gulf Insurance Company ("Gulf")[2] in which they agreed to become indemnitors for

---

[1] This section contains only those facts that are pertinent to resolving the issues presented in the motion for summary judgment and the Defendants' reply brief.

[2] Travelers is a successor in interest to Gulf.

certain bid, performance, and payment bonds, issued in connection with a construction contract entered into by Environmental Construction Group ("ECG") for work at the Greater Rochester International Airport. (Doc. 47, Pl. Brief in Support, Ex. B, GAI). The GAI was signed by Matthew Kichman, President of ECG, in his corporate and individual capacities, as well as by Peter Ballantine, in his individual capacity, and Ben Wootton, in his individual capacity. The GAI also bears what are purported to be the signatures of Alison Ballantine and Patricia Wootton in their individual capacities. However, their husbands, Peter and Ben, actually signed the GAI on their behalf. (Doc. 48, Def. Statement of Fact, Ex. 2, Ballantine Dep. p. 19-21; Ex. 3, Wootton Dep. p. 19-20).

During negotiations for the indemnification agreement, Gulf was represented by Brent Headley as its attorney-in-fact. (*Id*. at Ex. 1). The Defendants contend that in January 2004, Kichman, Headley, and Peter Ballantine meet to discuss the bonding for the Rochester Project. (*Id*. at Ex. 2, Ballantine Dep. p. 16). Peter Ballantine testified that he specifically told Headley that he and Ben Wootton were only willing to underwrite the bonds up to $300,000. (*Id*. at pp. 21-2). It was his understanding that any agreement they entered into would be for no more than $300,000. (*Id*. at p. 23). Ben Wootton testified that about the time of the January 2004, meeting, Headley called him to introduce himself and discuss the meeting

he had had with Kichman and Ballantine. (*Id*. at Ex. 3, Wootton Dep. p. 17). He said that during this conversation, he confirmed with Headley that the bond amount was to be for $300,000. (*Id*. at pp. 19-20).

Shortly after the January 2004, meeting, Kichman presented the GAI to both Ballantine and Wootton for their signatures. Kichman approached Ballantine in his office and told him that he needed to sign the GAI. (*Id*. at Ex. 2, Ballantine Dep. p. 18). Ballantine signed the GAI for both himself and his wife but does not recall checking to see if it limited their liability to $300,000. (*Id*. at pp. 19-20, 22). He testified that he looked through it quickly and that he did not see the complete GAI until almost a year later. (*Id*. at pp. 20, 22). Wootton was also approached by Kichman to sign the GAI. He testified that at the time he signed, he only saw the signature page. (*Id*. at Ex. 3, Wootton Dep. p. 20). He confirmed with Kichman that the agreement was for $300,000 and then signed on behalf of himself and his wife. (*Id*.). He did not read the agreement before he signed it but instead relied on his conversations with Kichman and Headley. (*Id*. at p. 21). Wootton did not request a copy of the GAI until 2005. (*Id*. at p. 22).

Headley testified that when he was approached by Kichman regarding bonding for the Rochester Project, Kichman told him that ECG would bid $300,000 for the work it would

perform. (*Id*. at Ex. 1 Headley Dep. p. 15). When he submitted the application for a bid bond to Gulf, it was based on the $300,000 figure, which Gulf approved[3]. (*Id*.). At some point after the issuance of the bid bond, Headley became aware that the bid submitted by ECG on the Rochester Project was actually for $489,856. (*Id*. at p. 16, 31). Headley informed Kichman that since the bid bond had been approved by Gulf at $300,000, Kichman should have notified him of the increased bid amount prior to submitting the bid. (*Id*. at p. 29). Despite this, Gulf ultimately issued payment and performance bonds in the amount of $489,856. (*Id*. at 18, Doc. 47, Pl. Brief in Support, Ex C).

      Headley also testified that he does not recall having any conversations regarding indemnity agreements with Kichman, Ballantine, or Wootton. (Doc. 48, Def. Statement of Fact, Ex. 1 Headley Dep. pp. 14-5, 38). Headley did not have any discussion with Ballantine and Wootton regarding the amount that they were willing to indemnify in the GAI and denies any conversation about their willingness to sign the GAI for a $300,000 project bid. (*Id*. at pp. 19-20). He specifically does not recall the January 2004, meeting to which Ballantine and Wootton testified. (*Id*. at p. 34). Further, he does not recall discussing the issuance of the performance or payment bonds with them. (*Id*. at

---

[3] The bid bond was not issued for the amount of $300,000 but rather for a percentage of the bid. (*Id*. at p. 18).

4

pp. 39-40).  Finally, he testified that he never told Ballantine or Wootton that their indemnity obligations would be limited under the GAI or that the GAI would apply only to the bid bond. (Doc. 51, Pl. Reply, Ex. E, pp. 51-2).

Travelers ultimately received claims on the payment and performance bonds issued by Gulf.  (Doc. 47, Pl. Brief in Support, Ex. A, Wilson Affidavit, ¶5).  These claims totaled 188,923.33.  (*Id*. at ¶ 6).  Travelers has also incurred $20,947.12 in attorney's fees, litigation costs and expense in connection with the bonds (*Id*. at ¶ 7; *see also* Ex. D).  To date, the losses incurred by Travelers with respect to the bonds totals $209,870.45.  (*Id*. at Ex. A, Wilson Affidavit, ¶8).  They are seeking $165,291.15 of this amount from the Defendants since $44,579.30 is covered under other agreements.  (*Id*. at ¶¶ 9-11).

III.  Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986).  In reviewing the evidence, facts and inferences must be viewed in the light most

favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 553 (1986).  Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  475 U.S. at 586-87, 106 S. Ct. at 1356, 89 L. Ed. 2d at 552 (citations omitted).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  *Versarge v. Township of Clinton*, 984 F.2d 1359, 1370 (3d Cir. 1993).

IV.   Discussion

The Plaintiff contends that the GAI obligates the Defendants to indemnify it for the costs, losses, and expenses it incurred when it made payments in connection with the Performance and Payment bonds issued on behalf of ECG. Travelers maintains that the terms of the GAI are clear and unambiguous.  The Defendants raise two arguments in opposition to summary judgment.  First, they argue that the doctrine of mutual mistake applies to the notice provision of the GAI. Second, they contend that evidence of a material modification to the contract exists and as such, summary judgment is not appropriate.

    A.   <u>Mutual Mistake</u>[4]

In Pennsylvania[5], indemnity agreements are interpreted under the rules governing contracts. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa.Super. 2000). The main consideration in contract interpretation is the intent of the parties. *Hutchinson v. Sunbeam Coal Corp.*, 513 Pa. 192, 200, 519 A.2d 385, 389 (Pa. 1986). "The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." *Hutchinson*, 513 Pa. At 2000, 519 A.2d at 390.

The Plaintiff maintains that the language in the GAI is clear and unambiguous. The Defendants contest this and argue that the GAI does not express the true intent of the parties because of a mutual mistake. Defendants contend that the parties had agreed that they would be notified should the amount of the bid or bonds exceed $300,000. Defendants argue that the failure of the GAI to include this notice provision is a mistake. They assert that the evidence presented, viewed in a light most favorable to them, demonstrates that a mutual mistake occurred and that Plaintiff should not be granted summary judgment.

---

[4] We note that the parol evidence rule does not preclude us from considering conversations that took place prior to the signing of the GAI to determine if a mutual mistake exists. *Hart v. Arnold*, 884 A.2d 316, 333 (Pa.Super. 2005).

[5] The parties do not appear to dispute that Pennsylvania law applies in this case.

Pennsylvania follows the Restatement (Second) of Contracts when determining mutual mistake.

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

*Hart v. Arnold*, 884 A.2d 316, 333 (Pa.Super. 2005)(*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 152 (1981)). A party bears the risk of a mistake if the parties have agreed that one party bears the risk, a party makes a contractual agreement and at the time the agreement is made "...treats his limited knowledge [of the facts relating to the mistake] as sufficient," or the court allocates the risk to a party because it is reasonable to do so. *Id*. at 334 (*citing* RESTATEMENT (SECOND) OF CONTRACTS § 154 (1981)).

> A contract entered into under a mutual misconception as to an essential element of fact may be rescinded or reformed upon the discovery of the mistake if (1) the misconception entered into the contemplation of both parties as a condition of assent, and (2) the parties can be placed in their former position regarding the subject matter of the contract.

*Id*. (*citing Gocek v. Gocek*, 417 Pa.Super. 406, 612 A.2d 1004, 1006 (1992)).

Having reviewed the facts before us, we find that there is no evidence to support the Defendants' claim of mutual mistake with regard to the notice provision of the GAI. To begin, there is no direct evidence that the Defendants and Gulf,

through Headley or otherwise, ever agreed to have a contract that required notice to the Defendants should the bid or bonds exceed $300,000. In fact, the Defendants do not contend that the notice requirement was explicitly discussed by the parties. Rather, they argue in their brief that the notice to them of any increase in the amount of the bid or bonds in excess of $300,000 was an implicit agreement because the Defendants and Headley understood that Gulf would only issue bonds up to $300,000 and that the Defendant would only indemnify bonds up to $300,000.

     We disagree. Contrary to the Defendants' assertions, there is no evidence to suggest that Gulf would only issue bonds up to $300,000. At most, the evidence shows that Gulf issued the bid bond on the assumption that the bid on the Rochester Project would be for $300,000. However, after Gulf learned that the bid exceeded $300,000, it still issued payment and performance bonds in the amount of the actual bid, $489,856. Further, while Ballantine and Wootton testified to their understanding that the bond would be limited to $300,000, there is no testimony on their part, or on Headley's part, that they were told by Headley or anyone else at Gulf that Gulf would not issue bonds in excess of $300,000. The lack of evidence to support the assertion that Gulf intended to only issue bonds up to $300,000, even assuming that, as the Defendants' testified, they told Headley that they would only agree to liability up to

$300,000, means that the Defendants' "implicit agreement" argument must fail.

Assuming, *arguendo*, that both parties intended to provide for notice of a bid or bonds in excess of $300,000, we could not find that the doctrine of mutual mistake applies in this instance.  First, we find that in the circumstances presented here, it is reasonable to allocate the risk of the mistake to the Defendants as it is quite clear that they did not read the GAI before signing it.  *See Behavioral Health Industry News, Inc. v. Lutz*, 24 F.Supp.2d 401, 402 (M.D.Pa. 1998)(Caldwell, J.)(noting that parties are obligated to read contracts before signing them).  Further, Travelers has already paid claims from the bonds that were issued.  It would not be possible to place the Plaintiff in the position that it was in before the execution of the GAI, as required by the doctrine of mutual mistake.  *See Hart*, 884 A.2d at 334.

    B.   <u>Material Modification</u>

Having found that mutual mistake does not apply, we turn to the Defendants' second argument, that the increase in the bond amount constitutes evidence of a material modification to the GAI and as such, summary judgment is not appropriate. The Plaintiff contends that the Defendants have not met their burden of showing that the increase is evidence of a material modification and that the Defendants waived their right to notice of modifications to the bonds and their liability.

10

A surety's liability may be affected if a creditor and a debtor materially alter their relationship without obtaining the consent of the surety. *Continental Bank v. Axler*, 353 Pa.Super. 409, 715-6, 510 A.2d 726, 729 (Pa.Super. 1986). "A material modification in the creditor-debtor relationship consists of a significant change in the principal debtor's obligation to the creditor that in essence substitutes an agreement substantially different from the original agreement on which the surety accepted liability." *Continental Bank*, 353 Pa.Super. at 416, 510 A.2d at 729. A compensated surety[6] can have his liability discharged if the there was a material modification without his consent and the surety's risk has been substantially increased. *Id*. However, a surety may consent to material modifications that will affect his obligations in the suretyship contract. *Continental Bank*, 353 Pa.Super. at 417, 510 A.2d at 730. Further, a surety may waive notice of material modifications with specific language in the surety agreement. *Reliance Ins. Co. v. Penn Paving, Inc.*, 557 Pa. 439, 450-3, 734 A.2d 833, 838-40 (Pa. 1999).

In the instant case, the GAI provides, in pertinent part, that:

> ...it shall not be necessary for the Company to give the Indemnitors, or any one or more of them, notice of the execution of any such

---

[6] The GAI provides that the Defendants liability is that of a compensated surety. (Doc. 47, Pl. Brief in Support, Ex. B, ¶ 13).

11

> bonds, nor of any fact or information coming
> to the notice or knowledge of the Company
> affecting...the rights or liabilities of the
> Indemnitors under any such bond executed by
> it, notice of all such being hereby
> expressly waived.

(Doc. 47, Pl. Brief in Support, Ex. B, ¶ 7).  Based on this language, we must agree with Travelers that the Defendants waived notice of facts that affected their liability under bonds issued pursuant to their indemnification agreement.  Under the agreement, Gulf had no obligation to inform the Defendants that the bid was in excess of $300,000, that the bonds were executed in an amount in excess of $300,000, and that the Defendants' liability had increased.  Thus, even if the increase in their liability constitutes a material modification, the Defendants waived notice.

    C.   <u>The GAI and Damages</u>

Having found that the Defendants are unable to avoid liability under the arguments that they presented, it is clear that under the terms of the GAI, they are liable to Travelers.  The GAI provides that:

> The Indemnitors will indemnify and save the
> Company harmless from and against every
> claim, demand, liability, cost, charge,
> suit, judgment and expense which the Company
> may pay or incur in consequence of having
> executed, or procured the execution of, such
> bonds, or any renewals or continuations
> thereof or substitutes therefor, including
> fees of attorneys, whether on salary,
> retainer or otherwise, and the expense of
> procuring, or attempting to procure, release
> from liability, or in bringing suit to
> enforce the obligation of any of the

12

>     Indemnitors under the Agreement.  In the
>     event of payment by the Company, the
>     Indemnitors agree to accept the voucher or
>     other evidence of such payment as prima
>     facie evidence of the propriety thereof, and
>     of the Indemnitor's liability thereof to the
>     Company.

(Doc. 47, Pl. Brief in Support, Ex. B, ¶2). This paragraph covers the claims made against the bonds[7] and the attorney's fees incurred by Travelers. The Defendants, in their response to the Plaintiff's statement of facts, contend that the attorney's fees were not solely incurred by Travelers in connection with the bonds. However, they provide no evidence or argument to support this contention. Further, they make no argument that amounts requested for attorney's fees are unreasonable. Finally, they have not provided any evidence or argument to challenge the amounts Travelers has paid on the bonds, as set forth in the Wilson Affidavit. Having reviewed the evidence submitted by Travelers, which includes not only the amounts that it has paid on bond claims, but a detailed accounting of the attorney's fees incurred in this case, we find that judgment should be entered for the Plaintiff in the amount of $165,291.15.

---

[7] In a footnote, the Defendants contest the validity of the bonds since they are not signed. They have provided no argument to support this position. The GAI provides, however, that the Indemnitors' liability is not affected by the failure of ECG to sign the bonds. (Doc. 47, Pl. Brief in Support, Ex. B, GAI, ¶2).

V.      Motion in Limine

        Since we are granting summary judgment, we will dismiss Travelers' Motion in Limine to preclude parole evidence as moot and will enter an appropriate order.


                                        /s/William W. Caldwell
                                        William W. Caldwell
                                        United States District Judge

Date: May 30, 2006

```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
```

THE TRAVELERS INDEMNITY          :
COMPANY, Successor in Interest
by Merger to GULF                :
INSURANCE COMPANY,
          Plaintiff              :

          vs.                    :   CIVIL NO. 1:CV-05—1864

PETER BALLANTINE,                :
ALISON BALLANTINE,
BEN WOOTON,                      :
PATRICIA WOOTON,
          Defendants             :


                          O R D E R

     AND NOW, this 30th day of May, 2006, upon consideration of Plaintiff's motion for summary judgment, filed April 21, 2006, (Doc. 45), it is Ordered that the motion is granted. The Clerk of Court shall enter judgment in favor of the Plaintiff, Travelers Indemnity Company, and against the Defendants, Peter Ballantine, Alison Ballantine, Ben Wootton, and Patricia Wootton, in the sum of $165,291.15. It is further Ordered that the Plaintiff's motion in limine (Doc. 43) is dismissed as moot.

     The Clerk of Court shall close the file.


                              /s/William W. Caldwell
                              William W. Caldwell
                              United States District Judge